IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
ASHEVILLE DIVISION
CIVIL CASE NO. 1:08cv474

| | |
|---|---|
| JOE H. METCALF, )<br>)<br>Plaintiff, )<br>)<br>vs. )<br>)<br>MICHAEL ASTRUE, )<br>Commissioner of Social Security, )<br>)<br>Defendant. )<br>) | **MEMORANDUM OF<br>DECISION AND ORDER** |

**THIS MATTER** is before the Court on the Plaintiff's Motion for Summary Judgment [Doc. 12] and the Defendant's Motion for Summary Judgment [Doc. 14].

## I. PROCEDURAL HISTORY

The Plaintiff Joe H. Metcalf entered a protective filing of an application for disability insurance benefits on May 28, 2003, alleging that he had become disabled as of November 15, 2002. [Transcript ("Tr.") 75-77]. The Plaintiff's application was denied initially and on reconsideration. [Tr. 54-58, 61-63]. A hearing was held before Administrative Law Judge ("ALJ") Kevin F. Foley on June 13, 2007. [Tr. 970-1001]. On September

20, 2007, the ALJ issued a decision denying the Plaintiff benefits. [Tr. 18-34]. The Appeals Council denied the Plaintiff's request for review, thereby making the ALJ's decision the final decision of the Commissioner. [Tr. 6-8]. The Plaintiff has exhausted all available administrative remedies, and this case is now ripe for review pursuant to 42 U.S.C. § 405(g).

## II. STANDARD OF REVIEW

The Court's review of a final decision of the Commissioner is limited to (1) whether substantial evidence supports the Commissioner's decision, see Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971), and (2) whether the Commissioner applied the correct legal standards, Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). The Court does not review a final decision of the Commissioner de novo. Smith v. Schweiker, 795 F.2d 343, 345 (4th Cir. 1986).

The Social Security Act provides that, "[t]he findings of the [Commissioner] as to any fact, if supported by substantial evidence, shall be conclusive. . . ." 42 U.S.C. § 405(g). The Fourth Circuit has defined "substantial evidence" as "more than a scintilla and [doing] more than creat[ing] a suspicion of the existence of a fact to be established.

It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Smith v. Heckler, 782 F.2d 1176, 1179 (4th Cir. 1986) (quoting Perales, 402 U.S. at 401, 91 S.Ct. at 1427).

The Court may not re-weigh the evidence or substitute its own judgment for that of the Commissioner, even if it disagrees with the Commissioner's decision, so long as there is substantial evidence in the record to support the final decision below. Hays, 907 F.2d at 1456; Lester v. Schweiker, 683 F.2d 838, 841 (4th Cir. 1982).

## III.   THE SEQUENTIAL EVALUATION PROCESS

In determining whether or not a claimant is disabled, the ALJ follows a five-step sequential process. 20 C.F.R. §§ 404.1520, 416.920. If the claimant's case fails at any step, the ALJ does not go any further and benefits are denied. Pass v. Chater, 65 F.3d 1200, 1203 (4th Cir. 1995).

First, if the claimant is engaged in substantial gainful activity, the application is denied regardless of the medical condition, age, education, or work experience of the applicant. 20 C.F.R. §§ 404.1520, 416.920. Second, the claimant must show a severe impairment. If the claimant does not show any impairment or combination thereof which significantly limits the claimant's physical or mental ability to perform work activities, then no

severe impairment is shown and the claimant is not disabled.  Id.  Third, if the impairment meets or equals one of the listed impairments of Appendix 1, Subpart P, Regulation 4, the claimant is disabled regardless of age, education or work experience.  Id.  Fourth, if the impairment does not meet the criteria above but is still a severe impairment, then the ALJ reviews the claimant's residual functional capacity (RFC) and the physical and mental demands of work done in the past.  If the claimant can still perform that work, then a finding of not disabled is mandated.  Id.  Fifth, if the claimant has a severe impairment but cannot perform past relevant work, then the ALJ will consider whether the applicant's residual functional capacity, age, education, and past work experience enable the performance of other work.  If so, then the claimant is not disabled.  Id.  In this case, the ALJ's determination was made at the fifth step.

### IV.  FACTS AS STATED IN THE RECORD

The Plaintiff was born on March 24, 1964 and was 43 years old at the time of the ALJ's hearing.  [Tr. 75].  The Plaintiff completed 9th grade, and later obtained a GED.  [Tr. 985, 993].  He subsequently started but did not complete courses in English [Tr. 993] and typing [Tr. 994].  His past relevant work includes work as a cab driver.  [Tr. 977].

After working 10 years as a cab driver, during which he developed knee problems leading to a surgery that did not resolve the problems [Tr. 977], he quit because his mental health problems, including lack of impulse control, got him into dangerous physical situations with passengers. [Tr. 978]. He worked for Milkco for six months, first as a picker, and upon finding that this worsened his knee problems, switched to cleanup man, working as such until his legs would no longer permit [Tr. 977]. His last date of work was November 15, 2002 [Tr. 75-77]. After that, he made a few unsuccessful work attempts, typically temporary jobs where he completed one day here and there [Tr. 986]. He earned $756.78, $104.83, $581.91, $136.00, and $100.00 respectively at those jobs through 2003 and 2004. [Tr. 84].

Plaintiff indicates he is disabled by diabetes, leg problems, and mental health issues. [Tr. 974, 978].

He was diagnosed with diabetes in 1990. [Tr. 592]. He visited the Buncombe County Health Department beginning in September 1998 seeking insulin, having not had it for two years because he could not afford it, and presenting with tingling feet. [Tr. 593]. During an admission at Mission Hospital from August 7-11, 1999, the notes of his attending

physician, Dr. Blair Holl, indicate that "[a]t 35 and having renal problems, he is certainly a high risk for dialysis in the future.... This patient is on an Ace inhibitor for his kidney at this early age...". [Tr. 182]. The health department continued to treat him through July 2003. [Tr. 519-618]. He missed five appointments during those five years [Tr. 598, 600, 604], possibly contributing to his poor diabetes control [Tr. 608]. Homelessness, insecure housing including living without hot water, and lack of a driver license and transportation were variously noted. [Tr. 186, 410, 603, 604, 614, 296, 977]. Though insufficient finances affected his access to care, he took steps to get free care and medications through the health department [Tr. 519-618, 293], emergency rooms [Tr. 422, 425], and Project Access [Tr. 603, 604]. Several emergency room visits during December 2000 involved right foot pain and swelling, diagnosed as cellulitis and untreated diabetes.[Tr. 413-427] Radiology results showed mild degenerative changes of the right foot. [Tr. 417].

On June 17, 2001, Plaintiff went to the emergency room complaining that his "kidneys are burning," and that he had red urine. [Tr. 438-443]. Urinalysis was negative, based upon a car accident Plaintiff had two years earlier, he was diagnosed with lumbar strain. [Tr. 440]. It was noted that

6

he had been doing heavy work with trees, but no specific trauma was indicated. [Id.]. The Court notes that Plaintiff's kidney problems, including microalbuminaria (also known as proteinuria), were of record with that hospital at that time. [Tr. 181, 182, 593]; The deleterious effects of microalbuminaria are not detected by the conventional dipstick method of urinalysis; a microalbumin urine test must be performed. WebMD, Diabetes Health Center, Microalbumin Urine Test, http://diabetes .webmd.com/ microalbumin-urine-test?page=2 (last visited December 11, 2009); Yahoo! Health, Microalbumin Urine Test, http://health.yahoo .com/urinary-diagnosis/microalbumin-urine-test/healthwise--tu6440.html (last visited December 11, 2009). However, the only test performed during this admission was the urine dipstick test. [Tr. 435, 432-443].

Further sensation deficits from diabetes were noted on August 23, 2001 and July 16, 2002. [Tr. 468-481]. At the hearing, Plaintiff reported having only partial feeling in his feet, and unevaluated vision problems. [Tr. 980].

The earliest record evidence of Plaintiff's leg problems occurs on April 29, 1996. [Tr. 343]. In August 1999 he developed a staph infection of his left knee, and was diagnosed with pyogenic arthritis, whereupon he

underwent an arthroscopy and partial lateral meniscectomy of that knee. [Tr. 178-194] Radiologic exam of the left knee then showed degenerative changes in all 3 compartments of the knee, most marked at the lateral malleolus with bony patellar spurring, which was similar to that shown on scans in 1996. [Tr. 343].

He was again hospitalized days later, from August 25-September 1, 1999, during which the knee was drained twice more. [Tr. 195-236]. Eighty percent of the vastus medialis obliquus muscle was found to be dead and necrotic during the surgery. [Tr. 211]. The necrotic portion was removed, leaving only 20% of that muscle viable [Tr. 212], and leaving a 10-15 inch scar [Tr. 445]. He was diagnosed with acute necrotizing synovitis, with extensive necrosis in the thigh noted. [Tr. 238]. Orthopedically, only mild degenerative changes were noted in the knee. [Tr. 230]. Very poor dentition was noted then, and a dental consult was made. [Tr. 209] Several teeth were missing as well as two crowns, but no abscess was found. [Tr. 227]

While in the hospital, he was transferred to the Restorative Care Unit, where he received physical therapy from September 1-14, 1999 to receive gait training. [Tr. 240, 261]. During that period, the infection worsened

8

again and another drain procedure was performed on the knee. [Tr. 260, 261].

By October 6, 1999, he was experiencing discomfort due to arthritic change, but released to work with instruction to "not overdo it with regard to the left knee". [Tr. 290]. It was noted that he may have to limit his activities. [Id.]. He was released from infectious disease care of the knee in November 1999. [Tr. 292]. During a Social Security interview on October 22, 1999, the SSA Field Officer indicated "walking and standing appeared very hard for [Plaintiff]--shuffled slowly". [Tr. 119].

On August 8, 2001, he visited the emergency room with left knee pain on flexion and extension of a month's duration. [Tr. 445-452]. X-ray showed significant spurring and osteoarthritis. [Tr. 445]. Though that X-ray did not show fracture or dislocation, "there are many other structures in the knee" that can only be evaluated via MRI, which he recommended and referred him to "Asheville Ortho" [Id.]. Plaintiff did not follow through due to an inability to pay. [Tr. 293].

On August 23, 2001, Plaintiff was examined by Dr. Dale Mabe and rated his knee pain as varying from one to ten on a scale of ten. [Tr. 293]. Dr. Mabe noted a slight limp avoiding the left lower extremity, and limitation

to 1/4 of squatting due to left knee pain. [Tr. 295]. Getting on and off the exam table was difficult due to the left knee, and it had positive click test. He noted no muscle atrophy, and showed no awareness of the history of excision of the necrotic 80% of the vastus lateral medialis, a muscle of significant size, as noted above [Tr. 212], and in spite of his noting the scar resulting from its removal. [Id.] Both sitting and standing caused left leg pain after 20 minutes. [Tr. 296]. Walking causes it after 15-20 minutes. [Id.] Lifting over 15 pounds makes the left knee "go out". [Id.] Plaintiff told Dr. Mabe, as well as other providers, that he had some kind of "bowel" surgery at age 10.

Plaintiff again visited the emergency room after hitting his left knee on a what is variously described as a power jack [Tr. 457] and pallets [Tr. 453] on June 26, 2002. [Tr. 453-458]. He had discomfort on flexion and extension. On X-ray, moderate to severe degenerative joint disease of the left knee was found. [Tr. 465]. He was discharged with work limitations of no prolonged standing or walking. Department of Corrections records in April 2005 show him with bilateral degenerative joint disease and "unable to squat". [Tr. 688].

C. *Mental impairments*

On August 22, 2000 Plaintiff complained of depression over the past two years, and increasing thoughts of harming himself. He was diagnosed with acute depression. [Tr. 410-412]. He commenced regular treatment with Blue Ridge Mental Health in 2003 after a commitment to Broughton Hospital in May. [Tr. 619]. He was diagnosed with bipolar disorder and alcohol dependence, and discharged from Broughton with prescriptions for Neurontin and Wellbutrin. [Tr. 589-90]. He was again committed to Broughton from June 25 to June 27, 2003. [Tr. 586-590]. Blue Ridge Center worked with him focusing on maintaining stability and avoiding hospitalization. [Tr. 619-679] Many of their interventions involved obtaining free or reduced priced resources of housing, food, and medical care. [Id.]. Financial concerns were a regular stressor. [Id.]. Lithium was added to his medications on June 26, 2003. [Tr. 658]. Plaintiff had to be repeatedly counseled on continuous and appropriate use of lithium, not to refrain from it to "balance himself out". [Tr. 619-679; 667] At some point he was prescribed Seroquel, which the Department of Correction discontinued on January 18, 2005. [Tr. 686].

Plaintiff testified that he felt very discouraged and down, and then very much "up". [Tr. 978]. He had incidents on his job as a cab driver where he lost control of his impulses, and got in trouble. [Id.]. He was in jail for robbery at the time of the hearing. [Tr. 979]. He continued having depression, impulse control problems, and racing thoughts as of the time of the hearing, but was taking no mental health drugs. [Tr. 983-984, 986]. The prison doctor had chosen to discontinue his Seroquel; no record indicates why. [Tr. 978, 686]. He has not had a psychological evaluation, in prison or otherwise, in a substantial period of time. [Tr. 987]. Though records note substance abuse, and liver problems, there is no evidence of driving while impaired convictions, and the ALJ notes he appears able to abstain from intoxicants. [Tr. 592, 25, 30].

Plaintiff's medical history is also significant for consistent treatment with thyroid medication. [Tr. 755-955]. Plaintiff's medical history is also significant for consistent symptoms and treatment of liver problems. Records show he has acute hepatitis A [Tr. 589, 149] and hepatitis C [Tr. 618, 679], but cannot participate in interferon therapy for this because it is particularly debilitating and his other health conditions contraindicate it. [Tr. 981].

12

## V. THE ALJ'S DECISION

On September 20, 2007, the ALJ issued a decision denying the Plaintiff's claim. [Tr. 18-34]. Before engaging in the sequential evaluation, the ALJ reviewed Plaintiff's earnings records and application history, determining that Plaintiff's work history after the dates of his prior applications and his denial of this instant application did not justify reopening those prior claims. [Tr. 21]. He also determined the last date insured to be September 30, 2007. [Tr. 22].

Proceeding to the sequential evaluation, the ALJ found that the Plaintiff had not engaged in any substantial gainful activity since his alleged onset date. [Tr. 24]. The ALJ then found that the medical evidence established degenerative joint disease and bipolar disorder to be severe impairments. [Tr. 24]. The ALJ concluded, however, that those impairments did not meet or equal any of the impairments listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. [Tr. 26]. The ALJ then assessed the Plaintiff's residual functional capacity and determined that the Plaintiff was capable of light level work with additional limitations of no climbing ladders, ropes or scaffolds; no climbing more than one flight of stairs at a time; no kneeling, crawling, or squatting; no standing for more than one

hour at a time; no walking more than a half mile at a time; no high production demands; and only limited social demands. [Tr. 27]. Because the Plaintiff's past work exceeds the bounds of the Plaintiff's residual functional capacity, the ALJ concluded that the Plaintiff could not return to his past work. [Tr. 32] As an alternative finding, the ALJ employed the Medical-Vocational Grids found at 20 C.F.R. Part 404, Subpart P, Appendix 2, to find that Plaintiff's age, education, work experience and residual functional capacity indicate he could perform other work existing in the national economy. [Tr. 33]. Accordingly, the ALJ concluded that the Plaintiff was not "disabled" as defined by the Social Security Act from the alleged onset date of November 15, 2002 through the date of the decision, September 20, 2007. [Tr. 34].

## VI. DISCUSSION

The Plaintiff assigns error to the determination of the ALJ, asserting that the ALJ erred in failing to evaluate properly the effect of Plaintiff's disabling pain.

The determination of whether a person is disabled by non-exertional pain or other symptoms is a two-step process. "First, there must be objective medical evidence showing the existence of a medical

impairment(s) which results from anatomical, physiological, or psychological abnormalities and which could reasonably be expected to produce the pain or other symptoms alleged." Craig v. Chater, 76 F.3d 585, 594 (4th Cir.1996), citing 20 C.F.R. § 416.929(b); § 404.1529(b); 42 U.S.C. § 423(d)(5)(A). If there is such evidence, then the ALJ must then evaluate "the intensity and persistence of the claimant's pain, and the extent to which it affects her ability to work." Id. at 595, citing 20 C.F.R. § 416.929(c)(1) and § 404.1529(c)(1).

In determining whether there is objective medical evidence of an impairment, "the ALJ has a duty to review the whole record." Geiger v. Apfel, 68 Soc. Sec. Rep. Serv. 182, 2000 WL 381920 (M.D. Fla. 2000).

Significant in Plaintiff's records is the postoperative report of Dr. Herbert Phillips dated August 25, 1999. [Tr. 211-212]. During Plaintiff's nearly month-long hospitalization for massive infection of the left leg, Dr. Phillips operated on Plaintiff's leg and discovered "a necrotic death" of the vastus medialis muscle in the left leg. [Tr. 211]. The vastus medialis connects immediately to the left knee, of which Plaintiff complains throughout his testimony and medical records. Dorland's Illustrated Medical Dictionary, Plate 34 (31st Ed., Saunders Elsevier 2007). Eighty

percent of the muscle was found to be dead and was excised, leaving only 20% of that muscle viable [Tr. 212], and leaving a 10-15 inch scar [Tr. 445].

The ALJ's determination make no reference whatsoever to this objective evidence. The ALJ is not required to mention explicitly every item submitted into evidence. However, the death of a major muscle and its surgical removal are "medical impairments which result[] from anatomical [or] physiological... abnormalities" and they, along with their resulting 10-15 inch scar, "could reasonably be expected to produce the pain or other symptoms alleged". Craig at 594. The failure of the ALJ to address this issue at the first step is error.

The ALJ's error in the first step of the Craig process in turn cause the ALJ to err in the next step: evaluation of credibility. The ALJ found Plaintiff's "testimony regarding the intensity and limiting effects of his pain and other symptoms was not credible or consistent with the evidence, including his own statements to his treating and examining physicians" [Tr. 28-29]. The ALJ failed to consider the objective medical evidence noted above, and thus did not factor it into his credibility determinations. The ALJ also failed to consider Plaintiff's testimony about his "legs failing him" and

Dr. Mabe's record about Plaintiff's leg "go(ing) out" at 15 pounds lifting. These are additional symptoms consistent with the loss of muscle described in that operative report. [Tr. 296, 977]. The ALJ erred in failing to "consider all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence", as required by 20 C.F.R. 404.1529(a).

"In considering the credibility of the claimant's subjective allegations of pain, the ALJ must consider the following factors [which include] the extensiveness of the attempts (medical or nonmedical) to obtain relief...." McKenney v. Apfel, 38 F.Supp.2d 1249, 1259 (D.Kan. 1999)(citing Hargis v. Sullivan, 945 F.Supp. 1482, 1490 (10th Cir. 1991) (emphasis added)). The ALJ, however, failed to do so. Though finances were a constant barrier to Plaintiff's obtaining needed care, Plaintiff and his providers made consistent efforts to obtain free and reduced price care. [Tr. 186, 410, 603, 604, 614, 296, 977, 519-618, 293, 422, 425, 603, 604]. Plaintiff was encouraged in August 2001 to see an orthopedist and obtain an MRI to assess "other structures" (non-bony, including musculature) of his knee because of his continuing knee problems. [T. 445]. It was never obtained because Plaintiff could not afford it. [Tr. 293]. The ALJ disregarded

Plaintiff's efforts to obtain affordable care, but rather made conclusory statements in his decision about gaps in Plaintiff's treatment and his use of medications to support the conclusion that Plaintiff's testimony about pain and other symptoms are inconsistent with objective evidence. [Tr. 28]. This was error.

The ALJ also erred at step three. Evaluation under the relevant Listing takes into account "condition of the musculature (e.g., weakness, atrophy)". 20 CFR Part 404, Subpart P, App. 1, Listing 1.00 (C)(1). The specific sublisting relied upon by the ALJ, Listing 1.02, Major Dysfunction of a Joint, includes the signal feature, "characterized by gross anatomical deformity." The absence of 80% of a large muscle could constitute such a deformity. The ALJ, however, did not give consideration to the impact of Plaintiff's muscle loss on whether he met or equaled a listing.

In making the RFC determination, the ALJ failed to consider what resulting functional or structural limitations there would be from loss of all but 20% of a muscle directly linked to the knee in question. [Tr. 212]. In making an RFC finding, the ALJ must consider all of the claimant's impairments, including impairments that are not severe. 20 CFR 404.

1520(e), 404.1545, 416.920(e), and 416.945; SSR 96-8p. The ALJ's failure to do so in the RFC determination was error.

These errors require remand. Gavigan v. Barnhart, 261 F.Supp.2d 334, 341 (D.Md., 2003).

On remand, the ALJ shall review the operative report, develop the record regarding the disabling impact of the muscle excision and scarring that it indicates, pursuant to the Secretary's obligations under 20 C.F.R. 404.1512(d)-(f); perform the five-step evaluation in light of information arising therefrom, including discussion of the symptoms--particularly what pain and loss of function--could reasonably be expected from the conditions noted in the report, and how Plaintiff's symptoms fall within those parameters; and issue a new decision. Id.

In view of the remand, the Court does not address Plaintiff's other assignments of error. But he is not precluded from raising such issues on remand.

## O R D E R

Accordingly, **IT IS, THEREFORE, ORDERED** that the Plaintiff's Motion for Summary Judgment [Doc. 13] is **GRANTED**; the Defendant's Motion for Summary Judgment [Doc. 14] is **DENIED**; the decision of the

ALJ is **REVERSED** and this matter is hereby **REMANDED** pursuant to sentence four of 42 U.S.C. 405(g), for further proceedings in accordance with this decision.

The Clerk of Court is instructed that this ruling closes this action.

Signed: March 23, 2010

Martin Reidinger
United States District Judge

SEALED DOCUMENT with access to All Parties/Defendants